Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EMMANUEL MERVILUS, | |
| Plaintiff, | Civil Action No. 14-7470 (ES) (MAH) |
| v. | OPINION |
| UNION COUNTY, DANIEL VANISKA, and JOHN KAMINSKAS, | |
| Defendants. | |

SALAS, DISTRICT JUDGE

Before the Court is the motion of defendants John Kaminskas, Daniel Vaniska, and Union County (collectively, "Defendants") for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). (D.E. No. 163 ("Motion" or "Mot.")). Having considered the parties' submissions, the Court decides this matter without oral argument. Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). As set forth below, the Court GRANTS Defendants' Motion.

## I.      BACKGROUND[1]

### A.      Factual Background

This case challenges the polygraph procedures used to convict plaintiff Emmanuel Mervilus ("Plaintiff") of robbery and aggravated assault in New Jersey state court. *See State v. Mervilus*, 12 A.3d 258 (N.J. App. Div. 2011). In 2011, the New Jersey Appellate Division overturned Plaintiff's conviction for prejudicial error based on the improper admission of

---

[1]      The facts are drawn from the parties' statements of undisputed material facts. (D.E. No. 163 at 10–24 ("Defs. SMF") and D.E. No. 167-1 at 2–33 ("Pl. Res. SMF") (together, "SMF")). The Court also refers to certain additional statements of undisputed material facts submitted by Plaintiff, and Defendants' responses thereto. (D.E. No. 167-1 at 34–38 ("Pl. Supp. SMF") and D.E. No. 170-1 ("Defs. Res. SMF") (together, "Supp. SMF")). Unless otherwise noted, the facts are undisputed. In addition, all page citations to Docket Entry Numbers 163 and 132 refer to the pagination automatically generated by the Court's CM/ECF system.

polygraph evidence.  *Id.*  In a subsequent retrial, the polygraph results and related testimony were not admitted into evidence and the jury acquitted Plaintiff of all charges.  (SMF ¶ 43); *see Mervilus*, 12 A.3d at 258.  Prior to the acquittal, Plaintiff spent almost four years in prison for crimes he did not commit.  (D.E. No. 130 (citing D.E. No. 77 ("Amended Complaint" or "Am. Compl.") at 2); *see* D.E. No. 132 at 1).  Plaintiff initiated this action for alleged violations of his federal and state constitutional rights during the pendency of his first trial.  (*See generally* D.E. No. 1 ("Compl.")).

The Court begins with a recitation of the undisputed facts underlying Plaintiff's conviction and the operative claims.  In the early morning of October 19, 2006, Plaintiff walked down Morris Avenue in Elizabeth, New Jersey with his acquaintance, Daniel Desire.  (SMF ¶ 3). After stopping in a Dunkin' Donuts, Plaintiff saw a man, later identified as Miguel Abreu, walk towards him, jump into the street, and stop a passing police car.  (*Id.* ¶¶ 4–5).  Abreu informed two Elizabeth Police Department officers in the vehicle that he had just been stabbed and robbed by Plaintiff and Desire.  (*Id.* ¶ 6).  The officers arrested Plaintiff at the scene, and the Union County Prosecutor's Office ("UC Prosecutor's Office") later indicted him on charges of first degree robbery (in violation of N.J. Stat. Ann. § 2C:15-1), second and third degree aggravated assault (in violation of N.J. Stat. Ann. §§ 2C:12-1(b)(1)–(2)), and third degree possession of a weapon (in violation of N.J. Stat. Ann. § 2C:39-4(d)).  (*Id.* ¶¶ 9 & 12; D.E. No. 163-3, Defs. Ex. M, Mervilus Indictment).

Because Plaintiff had a prior, positive experience with a polygraph exam,[2] he agreed to take a polygraph in connection with his October 19, 2006 arrest and the correlating charges.

---

[2]     Plaintiff took a stipulated polygraph exam with the UC Prosecutor's Office in connection with a different criminal matter in the year 2006.  (SMF ¶ 13).  Erin Cadigan, a subordinate of defendant John Kaminskas, administered the prior polygraph exam and found Plaintiff to be truthful.  (*Id.* ¶¶ 13 & 31).  Thereafter, the charges against Plaintiff brought in relation to the previous criminal matter were dismissed.  (*Id.* ¶ 13).

(SMF ¶¶ 14–16).   Plaintiff believed a polygraph would accurately show that he was being truthful about his innocence and that the charges lodged against him would be dismissed.   (*Id.*). As such, Plaintiff agreed to take a polygraph exam administered by defendant John Kaminskas, the acting Lieutenant at the Union County Police Department ("UC Police Department").   (*Id.* ¶¶ 16–20).   Kaminskas issued a report concluding that Plaintiff was being deceptive, and Plaintiff disputes whether the evidence supports this conclusion.   (*Id.* ¶ 24; *see also* Pl. Res. SMF ¶ 24).

### i.      Defendant John Kaminskas's Polygraph Training

During the relevant period, Kaminskas performed polygraphs for the UC Prosecutor's Office upon its request.   (SMF ¶ 20).   By the time Kaminskas administered Plaintiff's polygraph exam in 2007, he had performed nearly 600 other polygraph examinations.   (*Id.* ¶ 37; D.E. No. 163-2, Defs. Ex. G, Kaminskas Polygraph Report on Plaintiff ("Kaminskas PR")).   Kaminskas received polygraph training in 1997 when, at the request of the UC Police Department, he attended twelve weeks of polygraph school at the National Training Center ("NTC") in Albany, New York.   (SMF ¶¶ 26–27).   At the NTC, Kaminskas received training in the Arther Method of polygraph examinations because the NTC's founder and its primary instructor was Dick Arther, a known pioneer in polygraphs.   (*See id.* ¶ 28; *see also* Pl. Res. SMF ¶ 86).   The parties agree that the polygraph procedure taught to Kaminskas involves at least some level of subjective evaluation.   (Supp. SMF ¶ 8).

Kaminskas later participated in continuing polygraph education opportunities, including courses offered by the NTC and meetings held by the New Jersey Polygraph Association ("NJPA").   (SMF ¶ 33).   As a result of information gleaned from NJPA meetings, Kaminskas requested, and the UC Prosecutor's Office purchased, an Axciton computerized polygraph, which Kaminskas used as part of Plaintiff's polygraph exam, in addition to utilizing the Arther

Method.  (*Id.* ¶ 34; *see* Kaminskas PR).  The Axciton program consists of proprietary software that scores polygraphs according to an algorithm.  (*See* SMF ¶ 35).  The parties appear to agree that the Axciton polygraph indicated that Plaintiff was "deceptive" based on the following question: "Do you know for sure who committed the crime?"  (SMF ¶ 36).  Plaintiff told Kaminskas that he knew who committed the crime, but Kaminskas "instructed [Plaintiff] to change his answer because [Plaintiff] could not know for sure if he had not been there" and only heard who committed the crime second-hand.  (Pl. Res. SMF ¶ 36; Supp. SMF ¶ 3).[3]

### ii.    The UC Police Department's Polygraph Policies and Procedures

Kaminskas was the polygraph operator for the UC Police Department when defendant Daniel Vaniska served as Chief.  (SMF ¶ 91; D.E. Nos. 77 & 132 ¶ 3).  It is undisputed that polygraph examinations were normally used in connection with criminal investigations.  (SMF ¶ 89).  Upon completion, polygraph results were forwarded to the appropriate investigating agency.  (*Id.* ¶ 97).  Although Vaniska approved and authorized Kaminskas's polygraph training, the UC Police Department did not have a "formalized policy or procedure" governing the administration of polygraph exams, nor did Kaminskas have supervisors that directly managed his administration of polygraph exams.  (*Id.* ¶¶ 87, 92, 98 & 101).  The UC Prosecutor's Office's polygraph policy consisted of one requirement: a stipulation from defense counsel and a county prosecutor who was not assigned to investigate the underlying case.  (*Id.* ¶ 96).  The stipulation entailed the parties' responsibilities and admissibility of the polygraph results in court.  (*Id.*).

Vaniska generally understood polygraph exams, but he did not receive related training and was thus unaware of the various methods in which one can conduct a polygraph exam.  (*Id.* ¶¶ 93 & 104).  The UC Police Department staff did not review Kaminskas's polygraph

---

[3]    In addition, because the Axciton scoring result provided to Plaintiff in discovery is dated years after the polygraph exam, Plaintiff disputes whether the scoring algorithm employed in the result was available in 2007.  (Pl. Res. SMF ¶ 35).

examinations, nor did it perform quality checks.   (Supp. SMF ¶ 20).   The UC Police Department—*not* the UC Prosecutor's Office—maintained responsibility for supervising, training, and disciplining Kaminskas in addition to paying his salary.  (Supp. SMF ¶ 23).

### B.   Procedural History

#### i.   Plaintiff's First Trial and the New Jersey Appellate Division's Reversal

As noted above, the New Jersey Appellate Division reversed Plaintiff's conviction "[b]ased on improper expert testimony concerning polygraph evidence." *Mervilus*, 12 A.3d at 258.  At the first trial, Kaminskas was tendered and accepted as an expert witness in light of the parties' stipulation.  (SMF ¶¶ 17 & 105).  The Appellate Division found that Kaminskas's testimony "implicated the very concerns" that the New Jersey Supreme Court voiced in *State v. A.O.*, 965 A.2d 152 (N.J. 2009)—"that jurors would perceive polygraph evidence as infallible and would give it disproportionate weight in deciding to convict or acquit a defendant." *Mervilus*, 12 A.3d at 262–63.  The Appellate Division noted that while Kaminskas "did not explicitly state that he believed defendant was guilty, his testimony implicitly constituted an opinion on defendant's guilt" as well as a general belief held by law enforcement that guilty individuals will fail polygraph exams.  *Id.* at 263.  Moreover, in *A.O.*, decided one year *after* Plaintiff's initial trial, New Jersey's highest court held that stipulated polygraph evidence "should be introduced only if the parties can first establish its reliability at an *N.J.R.E.* 104 hearing." *Id.* at 262 (quoting *A.O.*, 965 A.2d at 166).   Thus, after considering *A.O.*, the court remanded so that the State could prove the reliability of its polygraph evidence at an evidentiary hearing if it intended to rely on polygraph evidence at retrial.  *Id.* at 263–64.

Although the Appellate Division acknowledged that "[t]he improper polygraph could have made a difference to the outcome" of Plaintiff's first trial, it commented that "the State's

case hinged to a great degree on the victim's testimony." *Id.* at 264.  The victim, Abreu, testified

that he got a good look at Plaintiff and Desiree, but pointed to a third-party spectator when

prompted to make an in-court identification of the person who stabbed him.  *See id.* at 259.

On cross-examination, Abreu admitted that he could not make a positive in-court identification

of either attacker.  *Id.*  On retrial, Abreu again could not identify Plaintiff as his attacker.  (SMF ¶

43).

### ii.        Current Proceedings

Plaintiff initiated the instant lawsuit on November 26, 2014, against Union County, the

City of Elizabeth, the New Jersey Attorney General, and various individuals associated with the

UC Prosecutor's Office, UC Police Department, and Elizabeth Police Department.   (*See*

Compl.).  The complaint contained twenty-one counts alleging violations of 42 U.S.C. § 1983

and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-1, *et seq*.  (*See generally

id.*).   After motion practice as to some defendants, on October 5, 2016, Plaintiff filed the

operative Amended Complaint against Union County, Kaminskas, Vaniska, Elizabeth Police

Department police officers, Michael Barros and Edward Benenati, and detective Robert Perez.

(Am. Compl. at 4–5).   The Amended Complaint contains sixteen counts alleging various

violations under Section 1983 and the NJCRA.  (*See generally id.*).[4]

Thereafter, the Court denied the remaining Defendants' motion to dismiss the Amended

Complaint in a written opinion dated March 14, 2018.  (D.E. Nos. 100 & 130).  The parties

engaged in discovery and, on November 8, 2019, Defendants filed a joint motion for summary

---

[4]        Detective Perez and the arresting police officers, Barros and Benenati, moved for summary judgment in
early March 2018.  (D.E. Nos. 126, 127 & 129).  Shortly thereafter, the parties voluntarily dismissed all claims
against Barros and Benenati, and the Court denied their summary judgment motions as moot.  (D.E. Nos. 135 &
141).  On January 8, 2019, the Court granted summary judgment in favor of Perez.  (D.E. Nos. 142 & 143).
Resolution of these motions eliminated Counts VII–XVI in the Amended Complaint.  (*See* Am. Compl.).

judgment on Counts I through VI.  (Mot.).[5]  Defendants seek summary judgment on the counts lodged against Kaminskas: due process violations under Section 1983 (Count I) and the NJCRA (Count IV) for alleged use of unlawful polygraph tactics.  (Am. Compl. ¶¶ 227–41 & 270–84). Defendants also seek summary judgment on the remaining four counts against Union County and Vaniska: *Monell* claims for an allegedly unconstitutional custom, policy, and practice, and the alleged failure to supervise and train relating to allegedly unlawful polygraph tactics employed by Kaminskas (Counts II & III), as well as parallel claims under the NJCRA (Counts V & VI). (*Id.* ¶¶ 242–69 & 285–311).

After filing the instant Motion, the parties engaged in settlement discussions with Magistrate Judge Michael A. Hammer.  (D.E. Nos. 172, 175–76 & 178).  On June 11, 2020, the Undersigned held a status conference, and, with the parties' consent, ordered mediation pursuant to Local Civil Rule 301.1.  (D.E. Nos. 180 & 182).  The parties conducted one video mediation in August 2020, and subsequently informed the mediator that resumption would not be fruitful. (D.E. No. 183).  Accordingly, on September 30, 2020, the Court reinstated Defendants' Motion, which is fully briefed and ripe for determination.  (D.E. No. 163-1 ("Defs. Mov. Br."); D.E. No. 167 ("Pl. Opp."); D.E. No. 170 ("Defs. Reply")).  For the following reasons, Defendants' Motion is GRANTED.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  A dispute is genuine if a reasonable jury could find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[5]    In addition, Plaintiff moved to amend the operative complaint a second time on October 29, 2019.  (D.E. No. 158).  On February 4, 2020, Magistrate Judge Michael A. Hammer denied Plaintiff's second motion to amend. (D.E. No. 174).

Entry of summary judgment is precluded if there are "disputes over facts that might affect the outcome of the suit." *Id.*

On a summary judgment motion, the moving party bears the initial burden of showing that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. Once the moving party has met this burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Cosm. Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 51 (3d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal quotation marks omitted)). At the summary judgment stage, the Court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Drumgo v. Kuschel*, 684 F. App'x 228, 230 (3d Cir. 2017) (quoting *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)).

## III.    DISCUSSION

The Court will address arguments with respect to Counts I and IV against Kaminskas before turning to Counts II, III, V, and VI against Vaniska and Union County. In support of the Motion, as it pertains to Counts I and IV, Defendants argue that: (i) Plaintiff failed to adduce evidence that Kaminskas willfully and knowingly fabricated evidence in connection with Plaintiff's polygraph exam, and (ii) Plaintiff cannot establish that his polygraph result should have concluded he was truthful rather than deceptive. (Defs. Mov. Br. at 5–11). In addition, Defendants maintain that Kaminskas is entitled to qualified immunity as to all claims against him and good faith immunity as to Count IV under the NJCRA. (*Id.* at 11–14). Because the Court agrees that Plaintiff has failed to adduce sufficient evidence pertaining to his fabrication of evidence claim, the Court does not reach the immunity issues. *See, e.g.*, *Carney v. Pennsauken Twp. Police Dep't*, 598 F. App'x 80, 82 (3d Cir. 2015); *Rowley v. Sullivan*, No. 18-5241, 2020

8

WL 3542428, at *3 n.1 (D.N.J. June 30, 2020).

### A.    Fabrication of Evidence (Counts I & IV)

Under Section 1983, a claimant may seek a civil remedy for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The claimant must demonstrate that "some person has deprived him of a federal right . . . [and] that the person who has deprived him of that right acted under color of state or territorial law." *Halsey v. Pfeiffer*, 750 F.3d 273, 291 (3d Cir. 2014) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996)).

It is widely recognized that criminal defendants have a constitutional right to be free from having evidence fabricated against them in connection with legal proceedings. *See, e.g.*, *Halsey*, 750 F.3d at 292; *see also Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (acknowledging this right as early as 1959) (citing *Limone v. Condon*, 372 F.3d 39, 45 (1st Cir. 2004)). In *Halsey*, the Third Circuit held that a defendant may assert a stand-alone claim under Section 1983 premised on the Fourteenth Amendment if (i) he had been convicted at trial during which the prosecution used fabricated evidence and (ii) "there is a reasonable likelihood that, without the use of that [fabricated] evidence, the defendant would not have been convicted." 750 F.3d at 294. In recognizing this claim, the Third Circuit cautioned that a claimant should not survive a motion for summary judgment "unless he can demonstrate that the record supports a conclusion that the allegedly fabricated evidence was *so significant* that it could have affected the outcome of the criminal case." *Id.* at 295 (emphasis added).

Indeed, there are "hurdles facing a plaintiff alleging a due process violation for fabrication of evidence." *Black v. Montgomery Cty.*, 835 F.3d 358, 372 (3d Cir. 2016), *as*

*amended* (Sept. 16, 2016).   Indeed, "there is a notable bar for evidence to be considered 'fabricated.'"   *Id.*   "[T]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong."   *Id.* (quoting *Halsey*, 750 F.3d at 295).   Rather, "[t]here must be 'persuasive evidence supporting a conclusion that the proponents of the evidence' are aware that evidence is incorrect or that the evidence is offered in bad faith."   *Id.* (quoting *Halsey*, 750 F.3d at 295).   Thus, the Third Circuit has repeatedly cautioned that "it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case."   *Id.* (quoting *Halsey*, 750 F.3d at 295); *Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 70 (3d Cir. 2017).

As Plaintiff states, inherent to the Court's analysis is a determination of what constitutes "bad faith" in the context of a fabrication of evidence claim.   (Pl. Opp. at 17).   Neither *Halsey*, *Black*, nor *Boseman*—the leading cases that discuss the fabrication of evidence standard in the Third Circuit—touch on what "bad faith" means in the realm of a fabrication of evidence claim. *See generally Halsey*, 750 F.3d 273; *Black*, 835 F.3d 358; *Boseman*, 680 F. App'x 65.   Plaintiff proffers that bad faith is a deliberate indifference to the truth and cites to cases that discuss bad faith in other criminal contexts.   (Pl. Opp. at 17 (collecting cases)).

The Third Circuit has stated that in cases involving accusations that the government failed to adhere to evidence-handling procedures, "[a]bsent some proof of ill-will, a failure to follow procedure is insufficient to support a finding of government bad faith."   *United States v. Christian*, 302 F. App'x 85, 87 (3d Cir. 2008) (finding "no evidence . . . to suggest that the police purposely misplaced or destroyed the evidence or that any malicious intent accompanied [the officer's] failure to follow procedure").   In another case involving alleged bad faith prosecution

by the government, the Third Circuit commented that "'bad faith' means 'not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity[] . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'"  *United States v. Manzo*, 712 F.3d 805, 811 (3d Cir. 2013) (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999) and citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978) (defining "bad faith" in the law enforcement context to encompass "reckless disregard for the truth")).  Finally, in a matter where the district court suppressed DNA evidence where it had been obtained via a "materially and recklessly false warrant affidavit," the Third Circuit had to determine whether the affiant's conduct "evince[d] a reckless disregard for the truth."  *United States v. Brown*, 631 F.3d 638, 639, 642 (3d Cir. 2011). The court commented that "'[a]n assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'"  *Id.* at 645 (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)).  Although these cases interpret "bad faith" in different contexts, the Court refers to their interpretations of "bad faith" for guidance in the instant matter.

Defendants argue that Plaintiff's fabrication of evidence claim fails against Kaminskas because the record does not support that he (i) willfully fabricated evidence, (ii) knew Plaintiff's polygraph results were false, or (iii) acted in bad faith.  (Defs. Mov. Br. at 5–7).  Plaintiff counters that Kaminskas "so widely deviated from acceptable practices" and that his report "was so outside the bounds of accepted science on polygraph[s]" such that a jury *can* find that he either knowingly submitted a false polygraph or did so in bad faith, that is, with a "deliberate indifference to the truth."  (*Id.* at 16–17).  Defendants maintain that even under a deliberate or

11

reckless indifference standard, Plaintiff's lack of evidence with respect to Kaminskas's knowledge of false polygraph findings, statements, or doubts regarding the Arther Method, support summary judgment in their favor. (Defs. Reply at 5).

Plaintiff heavily disputes the reliability of the Arther Method that Kaminskas used to chart his independent analysis of Plaintiff's polygraph exam. (*See* generally Pl. Opp.). The parties each retained experts who reviewed Plaintiff's polygraph results and rendered opinions; Plaintiff retained Dr. Charles Honts and Defendants retained Dr. John Palmatier. (SMF ¶¶ 44–45; D.E. No. 163-3, Defs. Ex. O ("Honts Report") and Defs. Ex. P ("Palmatier Report")).[6] The parties' experts re-evaluated Plaintiff's polygraph chart utilizing a different method called the Utah Scoring Method. (SMF ¶ 46). Dr. Honts's score indicated that Plaintiff had been truthful, while Dr. Palmatier's score indicated that Plaintiff had been deceptive. (*Id.* ¶¶ 52–53). Defendants dispute the ways in which Dr. Honts re-evaluated Plaintiff's polygraph and calculated his score under the Utah Scoring Method. (*See id.* ¶¶ 56–57, 60–62, 66–68 & 72–73). Meanwhile, Plaintiff maintains that some of Dr. Palmatier's results can only be understood through testimony. (Pl. Res. SMF ¶¶ 69 & 74).

Furthermore, Dr. Honts opined that (i) the Arther Method is "highly flawed;" and (ii) Kaminskas knew, at the time of Plaintiff's polygraph in 2007, that the Arther Method was "highly flawed." (SMF ¶ 75). The parties heavily dispute, however, the veracity of Dr. Honts's opinion. (*Id.* ¶ 76). For example, Defendants take issue with Dr. Honts's conclusion as to Kaminskas's knowledge, which he based on three sources that expressly or implicitly criticized the Arther Method from 1974, 1977, and 2013, the latter of which Dr. Honts co-authored. (*Id.* ¶¶

---

[6]     Defendants argue that Dr. Honts's conclusion is inadmissible under Federal Rule of Evidence 702, which governs the admissibility of expert *testimony*, because his opinion is "bare . . . without any support or explanation." (Defs. Mov. Br. at 8–11). Even considering Dr. Honts's report, because the evidence does not support a fabrication of evidence claim, the Court need not address issues surrounding its admissibility under Rule 702. (*See* Defs. Mov. Br. at 2, 8–11; Pl. Opp. at 31–36).

76–77).   The source from 1974, which is critical of the Arther Method, is an unpublished doctoral dissertation, available only in microfilm housed in research libraries.  (*Id.* ¶ 78).  The source dated 1977 is a published article based on the 1974 unpublished dissertation.  (*Id.* ¶ 79).

At the outset, the Court notes that "[t]he question . . . is not whether a self-interested litigant can find an expert to say the defendants got it wrong, but whether the evidence— including any expert opinions—creates a genuine issue of material fact that [d]efendants fabricated that evidence."  *See Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 480–81 (6th Cir. 2018) (rejecting plaintiff's argument, based on his experts' opinions, that the defendants' conclusions were "far afield of what reasonable medical examiners/forensic pathologists could conclude").  Here, the Court's review of the record reflects that Plaintiff has not produced the type of "persuasive evidence"—expert or otherwise—from which a reasonable fact finder could conclude that Kaminskas fabricated evidence against him.

Central to the Court's inquiry is whether Kaminskas's knowledge—with respect to either the use of the Arther Method or Plaintiff's polygraph result—is a dispute of material fact under Plaintiff's fabrication claim.  *See Black*, 835 F.3d at 372.  For the reasons discussed below, Plaintiff has not identified evidence to support that Kaminskas knew of or was deliberately indifferent to the Arther Method's purported flaws such that the use of the method amounts to fabricated evidence.   Nor does the record reflect that Kaminskas knowingly or recklessly certified false polygraph results in Plaintiff's case or proffered untruthful testimony at Plaintiff's trial.

First, Dr. Honts's opinion—on what he believes Kaminskas generally knew or may have known about the Arther Method's alleged flaws—is not indicative of Kaminskas's knowledge at the time of Plaintiff's polygraph.  (*See, e.g.*, Honts Report).  Dr. Honts cites two sources that

either expressly or implicitly criticize the Arther Method from 1974 and 1977.  (*See* SMF ¶¶ 77–79).  Despite their age, there is no indication that Kaminskas read or had access to these sources—which were published nearly thirty years before Plaintiff's polygraph exam and twenty years before Kaminskas's polygraph training.  Indeed, as Plaintiff concedes, the 1974 source is available only in research libraries on microfilm.  (*Id.* ¶ 78).  And, even crediting Dr. Honts's co-authored article critiquing the Arther Method, the source's publication date—2013—contradicts the notion that Kaminskas had knowledge of the method's purported flaws when he administered Plaintiff's polygraph exam six years earlier in 2007.  Collectively, these sources do not amount to "pervasive evidence" that Kaminskas possessed knowledge of the Arther Method's alleged flaws when he administered Plaintiff's polygraph.  *See, e.g.*, *Halsey*, 750 F.3d at 295.  Thus, while Dr. Honts may dispute the validity of the Arther Method, his disagreement "is insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence."  *See Ferris*, 726 F. App'x at 481 (finding that defendants were entitled to qualified immunity on plaintiff's fabrication of evidence claim where the record revealed only inferences of negligence in the defendants' investigation of a child's cause of death) (quoting *Caminata v. County of Wexford*, 664 F. App'x. 496, 501 (6th Cir. 2016)).

Next, Plaintiff has not adduced evidence that Kaminskas harbored serious doubts regarding the reliability of the Arther Method.  Plaintiff attempts to impute such knowledge to Kaminskas based on his attendance at NJPA lectures and exposure to polygraph research.  (*See, e.g.*, Pl. Supp. SMF ¶ 14 (stating that Kaminskas heard, at NJPA lectures, "about the superiority of the Utah [M]ethod and the inaccuracy of global scoring methods")).  However, the Court's review of the case reflects that "there is no record evidence" of Kaminskas attending a NJPA lecture that criticized the Arther Method *before* he conducted Plaintiff's polygraph.  (*See* Defs.

14

Res. SMF ¶ 14).   Indeed, the deposition testimony cited by Plaintiff reveals that Kaminskas could not recall when he attended the relevant lecture in question.   (D.E. No. 167-3, Pl. Ex. 1, Kaminskas Deposition Transcript ("Kaminskas Depo. Tr.") at 165:15–167:21).

Similarly, Plaintiff argues that Kaminskas "knew that numerical, objective scoring methods were the *only* validated methods and that they were more accurate than the Arther Method."   (Pl. Opp. at 18 (citing Kaminskas Depo. Tr. at 83:19–84:16, 149:8–150:9 & 164:5–167:10) (emphasis added)).   Kaminskas's testimony, however, states otherwise.   (*See* Kaminskas Depo. Tr. at 149:9–150:9 (noting that "*in some instances*" Kaminskas's research indicated that numerical scoring was better than global scoring) (emphasis added)).   For example, when asked whether he had read research from the National Academy of Science on the "validity and reliability of a polygraph," Kaminskas admitted that he "probably" read a report prior to conducting Plaintiff's polygraph but testified that the report said polygraph science in general "wasn't valid or reliable."   (Kaminskas Depo. Tr. at 83:19–84:16).   During this portion of the deposition, neither Kaminskas nor Plaintiff's counsel differentiated between the various polygraph methods, if any, in which the National Academy of Science had referenced.   (*See id.*).

At most, Plaintiff's evidence suggests that Kaminskas knew superior polygraph methods may have existed.   (*See* Kaminskas Depo. Tr. at 149:9–150:9; *see also* D.E. No. 167-4, Pl. Ex. 16 (2007 NJPA slide deck on the Utah Scoring Method); D.E. No. 167-5, Pl. Ex. 17 (Kaminskas's credentials, including his polygraph training and continued education)).   Such knowledge standing alone, however, does not mean that Kaminskas "so widely deviated from acceptable practices" or acted "so outside the bounds of accepted science" when he used the Arther Method to conduct Plaintiff's polygraph.   (*See* Pl. Opp. at 16).   Similarly, mere knowledge of other, allegedly more reliable polygraph methods does not equate use of the Arther

Method to evidence fabrication.  Nor has Plaintiff shown how Kaminskas's knowledge of potentially more reliable polygraph methods is indicative of bad faith in this case—that is, Plaintiff has not shown how Kaminskas utilized the Arther Method with a reckless disregard or deliberate indifference to either the method's purported falsity or the alleged inaccuracy of Plaintiff's polygraph results.[7]  Moreover, even if Plaintiff's polygraph results were incorrect, that fact alone is insufficient; rather, Plaintiff must adduce "persuasive evidence" to show Kaminskas was "aware that [Plaintiff's polygraph] evidence [was] incorrect or that the evidence [had been] offered in bad faith."  *See Black*, 835 F.3d at 372.  Based on the evidence of record, no reasonable juror could find that here.

For the same reasons, the record does not reflect that Kaminskas either knowingly certified false polygraph results in Plaintiff's criminal case or acted with a reckless disregard or deliberate indifference to an alternative result.  While Plaintiff attempts to cast doubt on Kaminskas's overall failure to render at least five to ten percent of polygraphs results "inconclusive," he provides no evidence from which a reasonable juror could conclude that *his* polygraph result should have been inconclusive as opposed to untruthful.  (*See* Pl. Opp. at 19–20 (citing Kaminskas Depo. Tr. at 183:21–184:6)).[8]  Indeed, Plaintiff's statement—that "there is no way to determine whether [Kaminskas] overstated the results of a marginal case or just fabricated the result out of whole cloth"—undercuts Plaintiff's position and effectively concedes that he adduced no evidence to support that Kaminskas either knowingly rendered false

---

[7]     In addition, Kaminskas knew that the NTC lost its accreditation with the American Polygraph Association. (Pl. Supp. SMF ¶ 15 (citing Kaminskas Depo. Tr. at 168:10–170:6)).  Based on Kaminskas's deposition, it is unclear exactly when the NTC lost accreditation or when Kaminskas knew it to be true.  (*See* Kaminskas Depo. Tr. at 168:10–170:9).  However, in response to Defendants' statement of material facts, Plaintiff stated that the NTC lost its accreditation in 1998, one year *after* Kaminskas attended the program.  (Pl. Res. SMF ¶¶ 26 & 32).  Regardless, Plaintiff has not explained *why* the NTC's accreditation has any bearing on whether Kaminskas used the Arther Method in bad faith.

[8]     *See infra*, page 18–19 (citing Pl. Opp. at 36).

polygraph results or made conclusions in bad faith.  (Pl. Opp. at 20).[9]  Because the record falls short, no reasonable juror could find that Kaminskas knowingly certified false polygraph results in Plaintiff's case or acted in bad faith.

To the extent Plaintiff intended to claim that Kaminskas gave false testimony during his first trial, Plaintiff does not cite to any specific testimony on record.  (*See generally* Pl. Opp.).  Relevant here, "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong."  *Black*, 835 F.3d at 372 (quoting *Halsey*, 750 F.3d at 295).  Thus, even if Kaminskas falsely testified with respect to Plaintiff's purported guilt or the veracity of his polygraph methods or results, Plaintiff must provide "persuasive evidence" to overcome summary judgment.  *See id.*  He has not done so here.

Furthermore, Plaintiff has not identified a single case in which a fabrication of evidence claim survived summary judgment based on use of a purportedly inferior polygraph method that produced allegedly inaccurate results.  The Court's independent research revealed one non-binding case in which the court denied defendants' motion for summary judgment on plaintiff's fabrication of evidence and malicious prosecution claims where a polygraph had been conducted using the Arther Method.  *See Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 459 (S.D.N.Y. 2012).  However, the circumstances in *Deskovic* are distinguishable from the instant matter.

Briefly, Deskovic, a sixteen-year-old student, endured a six-to-eight-hour polygraph examination in connection with an investigation of the rape and murder of his fifteen-year-old classmate.  *Id.* at 447–48.  Stephens, the polygraph administrator, utilized the Arther Method and

---

[9]      Plaintiff's cited cases from sister circuits are inapposite.  (Pl. Opp. at 22–23); *see, e.g.*, *Brown*, 519 F.3d at 236–39 (affirming the denial of defendant's motion to dismiss on qualified immunity grounds rather than addressing the merits of plaintiff's allegations regarding fabrication of DNA evidence); *Pierce v. Gilchrist*, 359 F.3d 1279, 1300–01 (10th Cir. 2004) (same); *see also Gregory v. City of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006) (rejecting, on qualified immunity grounds, defendant's argument that the examiner's conduct amounted to mere negligence where she wholly failed to disclose the existence of two non-matching hairs from the victim's pantyhose, which could have exculpated plaintiff).

was allegedly "very aggressive in his questioning" of Deskovic, who "struggled socially, academically, and emotionally." *Id.* at 447–49 (noting that Stephens yelled at Deskovic, invaded his person space, asked him the same questions, and accused him of murdering his classmate despite Deskovic's pleas of innocence). By the end of the exam, Stephens allegedly encouraged Deskovic to verbalize a confession because the polygraph results showed that he committed the crimes. *Id.* Deskovic ultimately confessed to police officers following the polygraph exam and was convicted of rape and murder. *Id.* Roughly fifteen years after Deskovic's sentence, new a DNA analysis emerged connecting another person to the crimes; that individual confessed, resulting in Deskovic's release from prison. *Id.*

First, with respect to the alleged fabrication of evidence, Deskovic argued that Stephens attributed a statement to him that Deskovic maintains he never said. *Id.* at 452. The statement was used at trial to explain how Deskovic purportedly raped the victim without leaving traces of his DNA. *Id.* at 454. Although multiple individuals heard and took handwritten notes during Deskovic's polygraph, this statement appeared in Stephens's typed notes only, which surfaced seven to eight weeks after Deskovic's polygraph and after Stephens learned that Deskovic's DNA did *not* match DNA collected at the crime scene. *Id.* at 452–54. Thus, the court denied defendants' motion for summary judgment on plaintiff's fabrication of evidence claim because they did not provide "substantial evidence" to contradict Deskovic's recollection, and there were credibility issues with respect to Stephens's typed notes. *Id.* at 454–55.

Unlike *Deskovic*, this case does not entail a claim that Kaminskas attributed a fabricated statement to Plaintiff that he allegedly did not make. Here, the parties agree that Kaminskas asked Plaintiff whether he knew "for sure who committed the crime" and instructed Plaintiff to answer in the negative if he was not physically present but had learned who committed the crime

18

second-hand.  (Supp. SMF ¶ 3).  Plaintiff does not explicitly argue that Kaminskas's instruction to respond based only on first-hand knowledge amounted to fabrication or bad faith.  (*See* Pl. Opp. at 4 (arguing that this question "was scientifically improper and created a substantial likelihood of bias against a truthful (innocent) subject"); *see id.* at 36 (arguing that without this question, Plaintiff's polygraph results from the Axciton algorithm would have been inconclusive)).  Nonetheless, Kaminskas's instruction is not "persuasive evidence" of fabrication because he merely directed Plaintiff to respond based on his first-hand knowledge only; in other words, Kaminskas did not direct Plaintiff to respond with an incorrect or fabricated answer.

Second, Deskovic lodged a claim for malicious prosecution arguing that he was arrested, detained, and prosecuted without probable cause.  *Deskovic*, 894 F. Supp. 2d at 456.  Deskovic argued that Stephens "knew or should have known that probable cause did not exist" because Stephens knew that he had attributed a fabricated statement to Deskovic and that his confession had been coerced.  *Id.*  Again, the court denied defendants' motion for summary judgment because a reasonable juror could find that without the allegedly fabricated statement or Deskovic's confession, the state lacked probable cause to prosecute Deskovic.  *Id.* at 458.  In so finding, the court determined that based on the evidence, a reasonable juror could conclude that Stephens knew Deskovic's confession was coerced due to a "potentially unreliable and abusive polygraph examination."  *Id.* at 459–60.  Indeed, the Court cited a separate opinion from Dr. Honts that could support a juror's findings.  *Id.* at 459.[10]

Critically, however, the *Deskovic* court cited Dr. Honts's opinion under a completely

---

[10]     In *Deskovic*, Dr. Honts opined on: (i) the alleged pitfalls of the Arther Method; (ii) Deskovic's "outrageously long" polygraph, roughly three and a half hours beyond the purported average; (iii) the allegedly abusive and stress-inducing duration in which Deskovic was attached to the polygraph machine; (iv) Stephens's alleged use of aggressive techniques inconsistent with a valid polygraph exam; (v) the purported fact that over the course of six hours Deskovic was given coffee (a potential stress-inducer), but not food; (vi) Stephens's alleged use of improper terminology while interviewing Deskovic; and (vii) Stephens's alleged use of less accurate polygraph scoring methods and credibility assessments using improper methods.  *Id.* at 459.

different inquiry than the one at bar—that was, whether a reasonable juror could find that Deskovic's confession was coerced such that the state lacked probable cause to prosecute him. *Id.* at 459–61.  The allegedly unreliable polygraph examination became relevant because it "initiated the sequence of events leading to Deskovic's confession." *Id.* at 459.  Evidence pointing to the potential unreliability of the polygraph included the method employed *and* the conditions Deskovic endured—both of which could have affected the polygraph results and prompted a coerced confession. *Id.*  By contrast, Plaintiff's entire claim here rests on Kaminskas's alleged use of a flawed polygraph method.  Unlike *Deskovic*, Plaintiff proffers no evidence that Kaminskas verbally abused or harassed him, that he was held for an unreasonably long period of time, or that he was deprived of food or drink.  Moreover, the Court finds it instructive that the *Deskovic* court did not reference the potentially unreliable polygraph as a basis for which the jury could find *fabrication of evidence*; rather, Stephens's typed notes—specifically the allegedly false statement attributed to Deskovic—were the sole basis for evidence fabrication.

Lastly, although the non-moving party receives the benefit of all factual inferences on summary judgment, the non-moving party "must point to some evidence in the record that creates a genuine issue of material fact." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).  Plaintiff's attempt to create a dispute of material fact by urging the Court to submit the issue of Kaminskas's negligence to the jury is unavailing.  (*See* Pl. Opp. at 20).  Here, Plaintiff concedes that a fabrication of evidence claim cannot be grounded in negligence.  (*See id.* at 17 (acknowledging that the standards "in *Halsey* and *Black* make clear that bad faith is a sufficient *mens rea* beyond negligence to establish a claim for evidence fabrication under the Fourteenth Amendment")); *see also Ferris*, 726 F. App'x at 481.

Accordingly, because Plaintiff failed to provide the sort of "persuasive evidence" to support the conclusion that Kaminskas was "aware that [Plaintiff's polygraph] was incorrect or offered it in bad faith," *see Black*, 835 F.3d at 372, Defendants are entitled to summary judgment as a matter of law on Counts I and IV.[11]

**B.    *Monell* & NJCRA Claims (Counts II, III, V & VI)**

Finally, Defendants argue that they are entitled to summary judgment on Plaintiff's *Monell* and parallel NJCRA claims.  Plaintiff brings the following causes of action against Union County and Vaniska (collectively, the "Union County Defendants"):

- **Count II:** *Monell* Claim under Section 1983 for the Unconstitutional Custom, Policy and Practice and the Failure to Supervise and Train Related to Unlawful Polygraph Tactics

- **Count III:** Failure to Supervise and Train Claim under Section 1983 for the Unconstitutional Custom, Policy and Practice Related to Unlawful Polygraph Tactics[12]

- **Count V:** *Monell* Claim under the NJCRA for the Unconstitutional Custom, Policy and Practice and the Failure to Supervise and Train Related to Unlawful Polygraph Tactics

- **Count VI:** Failure to Supervise and Train Claim under the NJCRA Related to the Unconstitutional Custom, Policy and Practice of Unlawful Polygraph Tactics

(Am. Compl. ¶¶ 242–69 & 285–311).

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694

---

[11]    The legal framework for Plaintiff's NJCRA fabrication of evidence claim is analogous to Section 1983; thus, the same reasoning applies to Count IV.  *See Est. of Roman v. City of Newark*, 914 F.3d 789, 796 n.5 (3d Cir. 2019); *see also Ortiz v. New Jersey State Police*, No. 16-7976, 2017 WL 3671307, at *2 (D.N.J. Aug. 25, 2017) ("The NJCRA is interpreted as analogous to § 1983." (quoting *Szemple v. Corr. Med. Servs.*, 493 F. App'x. 238, 241 (3d Cir. 2012))), *aff'd*, 747 F. App'x 73 (3d Cir. 2018).  For the same reason, Counts II, III, V, and VI are analyzed together under Section 1983 below.  *See infra*, Section III.B.

[12]    The Court construes Count III as a *Monell* claim under Section 1983, consistent with its prior opinion in this matter.  *See Mervilus v. Union Cty.*, No. 14-7470, 2018 WL 1320672, at *4 (D.N.J. Mar. 14, 2018).

(1978) (holding that there is no *respondeat superior* liability under Section 1983). Rather, a municipality or local government may be liable under *Monell* if a plaintiff establishes (i) the existence of a relevant policy or custom and (ii) that the policy or custom caused the constitutional violation alleged. *Id.*; *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005). The Third Circuit has acknowledged that a "close relationship between policy-and-custom claims and failure-or-inadequacy claims" exists. *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019). However, the avenues for each are distinct: "a plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure-to-supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Id.* (noting that plaintiffs may allege claims sounding in both). In any event, a local government's "liability under § 1983 must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); *see also Monell*, 436 U.S. at 690–91.

Here, Plaintiff's remaining claims against the Union County Defendants are premised on Kaminskas's alleged use of unlawful polygraph tactics that resulted in a purported violation of Plaintiff's constitutional rights. (Am. Compl. ¶¶ 242–69 & 285–311). Because the Court found that Plaintiff has not adduced evidence to establish that Kaminskas committed a constitutional violation, Plaintiff's *Monell* claims against the Union County Defendants must fail. *See Sherrill v. City of Hoboken*, No. 20-1251, 2021 WL 4473392, at *2 (3d Cir. Sept. 30, 2021) (stating that "'there must still be a violation of the plaintiff's constitutional rights' for a *Monell* claim to proceed" (quoting *Johnson v. City of Phila.*, 975 F.3d 394, 403 n.13 (3d Cir. 2020))); *Vargas v. City of Philadelphia*, 783 F.3d 962, 975 (3d Cir. 2015) (holding that a viable *Monell* claim

requires a plaintiff to establish that her constitutional rights have been violated (citing *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim."))); *Startzell v. City of Phila*, 533 F.3d 183, 204 (3d Cir. 2008) ("For § 1983 liability to attach, [a]ppellants must show that the [c]ity was responsible for any constitutional violations. . . .  Because we have found that there was no violation of [a]ppellants' constitutional rights, we need not reach the claim against the [c]ity under *Monell*." (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992))); *Mosca v. Cole*, 217 F. App'x 158, 165 (3d Cir. 2007) ("Since [plaintiff] has not established any constitutional violations, his *Monell* claim fails as a matter of course."); *Smith v. Twp. of Clinton*, No. 17-935, 2018 WL 4188457, at *7 (D.N.J. Aug. 31, 2018) ("Because the [c]ourt finds that no constitutional violation took place, [p]laintiff's motion for summary judgment [on her *Monell* claim] is denied on this ground, and [d]efendants' motion is granted."), *aff'd*, 791 F. App'x 363 (3d Cir. 2019).[13]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in its entirety.  An appropriate Order accompanies this Opinion.

Date: October 26, 2021

*/s/ Esther Salas_____*
**Esther Salas, U.S.D.J.**

---

[13]    Because Defendants' motion for summary judgment on Counts II, III, V, and VI is granted, it need not address the parties' arguments with respect to whether Kaminskas was acting as an arm of the state.  (*See* Defs. Mov. Br. at 18–21; Pl. Opp. at 29–31).